J-S43029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF A.D.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: WESTMORELAND COUNTY CHILDREN'S BUREAU | |
| | No. 323 WDA 2017 |

Appeal from the Order Dated January 18, 2017
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 31 of 2016

| | |
|---|---|
| IN RE: ADOPTION OF A.D.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: WESTMORELAND COUNTY CHILDREN'S BUREAU | |
| | No. 324 WDA 2017 |

Appeal from the Order Dated January 18, 2017
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 31 of 2016

BEFORE: STABILE, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED AUGUST 31, 2017**

Appellant, the Westmoreland County Children's Bureau ("Agency"), appeals from the January 18, 2017, order denying Agency's petition for involuntary termination of the parental rights (the "TPR Petition") of D.A.C.

---

[*] Former Justice specially assigned to the Superior Court.

("Father") to his biological child, A.D.C. ("the Child"). Agency also appeals from the order of the same date denying Agency's petition to confirm consent by the Child's mother, M.L.A. ("Mother"), to adoption of the Child, pending final resolution of Father's parental rights (the "Consent Petition"). Upon our review of the record, we conclude that the trial court improperly considered evidence outside the record in rendering its determination — specifically the Child Permanency Plans ("CPPs") dated March 4, 2015, and February 4, 2016. Accordingly, we vacate the orders below and remand to the trial court for further proceedings consistent with this decision.

Father and Mother first met in 2007 and moved in together shortly thereafter. The Child was born in 2008; his half-brother, T.C. ("Brother"), was born in 2011. Trial Ct. Op., 1/18/17, at 2; Ex. WCCB-3, Order, 10/16/14, Findings of Fact, at 1 ¶ 1. On January 26, 2012, Father received primary physical custody of the Child and Brother ("the Children"), and they moved out of the family residence.

On February 11, 2013, Agency received a referral alleging that Brother was physically abused by Father's then-girlfriend, M.H. Trial Ct. Op., 1/18/17, at 3; Ex. Ct.-A at 2. Father agreed that M.H. would have no unsupervised contact with the Children. However, on January 31, 2014, Agency took the Children, after Father allegedly allowed M.H. to collect the Child from the bus stop on multiple occasions without supervision.

In February 2014, an adjudicatory hearing was held before a master; following the master's recommendation, the trial court ordered that physical and legal custody of the Children be transferred to Mother. Trial Ct. Op., 1/18/17, at 4; Ex. Ct.-A at 2; Ex. WCCB-3, Order, 10/16/14, Findings of Fact, at 1 ¶¶ 4-5; N.T., 11/3/16, at 103. Nevertheless, Mother left the Child unattended for a significant amount of time while she was supposed to be exercising primary physical custody, and, on September 14, 2014, the Child was again taken into Agency's custody.

On January 4, 2016, Mother consented to the termination of her parental rights via a signed consent to adoption. On March 17, 2016, Agency filed the petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8) and § 2511(b).[1] On May 11, 2016, the

---

[1] **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement

*(Footnote Continued Next Page)*

trial court held a hearing on the Consent Petition.  On November 3, 2016,

the trial court held an evidentiary hearing on the TPR Petition.

Agency's first witness at the TPR Petition hearing was Abigail

Ackourey, a behavior health clinician, who had been "providing supervised

visitation and hands-on parenting during the visitation as needed since

*(Footnote Continued)* ──────────

> of the child continue to exist, the parent cannot or
> will not remedy those conditions within a reasonable
> period of time, the services or assistance reasonably
> available to the parent are not likely to remedy the
> conditions which led to the removal or placement of
> the child within a reasonable period of time and
> termination of the parental rights would best serve
> the needs and welfare of the child.
>
> . . . .
>
> (8) The child has been removed from the care of the
> parent by the court or under a voluntary agreement
> with an agency, 12 months or more have elapsed
> from the date of removal or placement, the
> conditions which led to the removal or placement of
> the child continue to exist and termination of
> parental rights would best serve the needs and
> welfare of the child.
>
> . . . .
>
> **(b) Other considerations.—**The court in terminating the rights
> of a parent shall give primary consideration to the
> developmental, physical and emotional needs and welfare of the
> child.  The rights of a parent shall not be terminated solely on
> the basis of environmental factors such as inadequate housing,
> furnishings, income, clothing and medical care if found to be
> beyond the control of the parent.  With respect to any petition
> filed pursuant to subsection (a)(1), (6) or (8), the court shall not
> consider any efforts by the parent to remedy the conditions
> described therein which are first initiated subsequent to the
> giving of notice of the filing of the petition.

November of 2015." N.T., 11/3/16, at 3-4. The trial court summarized Ms. Ackourey's relevant testimony as follows:

> The Child became upset when Father was late for a visit, and was particularly upset when Father failed to attend [a] visit in August 2016. The reason offered by Father for the missed visit was problems with his transportation. Father had missed previous appointments as well for this same reason.
>
> Importantly, she testified that Father requested assistance with transportation to enable him to make the visits and to participate in hands-on parenting instruction, but that her agency "was unable to accommodate that." She also acknowledged that transportation had been an issue for Father "off and on" since the case was assigned to her [in November 2015]. . . . Two previous visits in June 2016 were canceled because of Father's lack of transportation. She had discussed the Father's transportation problem with the caseworker in June 2016, and the possibility of providing bus passes to Father. Father at the time apparently indicated that he could not afford bus passes to facilitate attendance at the visits.

Trial Ct. Op., 1/18/17, at 8 (quoting N.T., 11/3/16, at 26; citing *id.* at 24-25, 35-36).

Agency's next witness was Susan Reed, who had been retained by Agency in October 2014 to provide Father with "physical abuse non-offender's treatment." Trial Ct. Op., 1/18/17, at 8. The trial court summarized the relevant portion of Ms. Reed's testimony as follows:

> Father called Ms. Reed twice after a missed appointment scheduled for June 16, 2016, indicating that he had transportation problems. . . . Under cross-examination by Father's counsel, Ms. Reed indicated Father called her on June 16, 2016, the day of the last scheduled visit, to explain he could not attend the scheduled meeting, as he had a hole in his gas tank and thus had no transportation to get to the session. She also indicated he called a second time to explain his transportation difficulties. Thereafter Ms. Reed called the

[Agency] caseworker conveying [F]ather's concerns about transportation.

*Id.* at 9 (citing N.T., 11/3/16, at 37-38, 41-42).

Agency's following witness was Rachelle O'Malley, a senior clinician for the Children's Institute of Pittsburgh, who did an attachment and bonding assessment of Father and the Child. N.T., 11/3/16, at 48-49.

> Ms. O'Malley testified that in contradistinction to his Mother, whom the Child acknowledges abandoned him, "he recognizes that his father is there for him," but the Child was disappointed by Father's failure to attend visits and "lost patience" with Father. With regard to the missed visit in August 2016, Ms. O'Malley testified that the Child was very upset when Father failed to show for the visit and he ripped up a picture he had made for his Father. At the time, Ms. O'Malley told the Child that they would make an attempt to find out why his Father missed the visit, which she acknowledged seemed unusual, given Father had twice confirmed his attendance in accordance with the service provider's procedures. Ms. O'Malley later learned Father had attempted to attend the visit, but had trouble of some sort with his vehicle. She did not inform the Child of Father's attempt to attend the meeting, nor was she aware if anyone else had done so.

Trial Ct. Op., 1/18/17, at 13 (quoting N.T., 11/3/16, at 94-95; citing *id.* at 90, 97-99).

Amanda Bush, Agency's caseworker who was assigned to this matter on April 7, 2015, also testified. Trial Ct. Op., 1/18/17, at 13; N.T., 11/3/16, at 103.

> With regard to transportation, Ms. Bush testified that when she was initially assigned to the matter on April 7, 2015, Father indicated that he had difficulty with transportation. And so, not later than May or June 2015, [Agency] contracted for transportation services for Father. In order to receive transportation, Father would need to notify Ms. Bush in advance

to provide adequate time for transportation arrangements to be made.

*Id.* at 14 (citing N.T., 11/3/16, at 109). Ms. Bush testified, "That's been a standing offer, and [Father] has been reminded several times throughout the life of the case that if he does need transportation, he does need to contact me." N.T., 11/3/16, at 109.

> Before the August 2016 visit previously discussed, Father contacted Ms. Bush for transportation on only one occasion during her involvement in this case. . . . Regarding his difficulty attending visits and appointments, Ms. Bush acknowledged that Father had walked to numerous visits in the past, from his home in Jeanette to the relevant offices in Greensburg, which the [trial c]ourt notes is approximately five miles. . . . Father's visits with the Child were initially in his home, but were terminated at that location prior to Ms. Bush's involvement, due to alleged safety concerns resulting from the presence of lawnmowers and other equipment in the house, as well as the presence of an unidentified woman in Father's home, who was taking a bath in his home when the Child walked in upon her during a visit. No testimony from the then-assigned caseworker was presented regarding this incident. . . . Ms. Bush testified at length regarding the outside appearance and condition of Father's home, offering numerous exhibits of photographs of the outside of the home.

Trial Ct. Op., 1/18/17, at 14-15 (citing N.T., 11/3/16, at 110, 112, 115-16, 118-29); *see also* Ex. WCCB-4 (eleven photographs collectively marked as one exhibit).

Ms. Bush also testified that the condition of Father's home had been "regularly discussed throughout the life of this case" and that the only time the condition was adequate was "[w]hen [Father] cleaned up for the Section

8 inspection . . . approximately three months" prior to the hearing. N.T., 11/3/16, at 118. When asked about "hygiene," Ms. Bush responded:

> It's been covered in the context as a whole with the cleanliness of the home, having a clean space to prepare food, having a clean space for yourself. . . . There's no stability in the condition of the home; there's no stability in hygiene; there's no stability in the safety hazards being present or not in the home.

*Id.* at 130. During cross-examination, "Ms. Bush acknowledged Father's numerous transportation problems, indicating that Father had a variety of vehicles during the case, all of which appeared to be unreliable." Trial Ct. Op., 1/18/17, at 15 (citing N.T., 11/3/16, at 148).

Father testified on his own behalf. The trial court summarized his relevant testimony as follows:

> When Father "first started coming" to the [Agency], he told them that he "needed transportation. They couldn't provide it. [He] told them [he]'d try to get [t]here as best [he] could." Father described some of the efforts the [Agency] made to get him bus passes, indicating that bus passes were not put into his mailboxes as promised, and that though perhaps available in the [Agency's] offices, he could[ not] get there to pick them up. Further, he testified his vehicles "went down" often and that transportation was the reason he couldn't complete services.
>
> Thereafter, the following exchange occurred:
>
> > Q: Did you ever have conversation with Amanda Bush about your transportation?
> >
> > A: She said at that point they couldn't do nothing. What she's referring to presently is she said, they're going to terminate your rights, and if you need your transportation, then I can give it to you now. I don't understand why she could do it now, but not before. That's why I haven't been there at all them appointments I was supposed to make.

. . . .

> I understand, you know, people have a hard time getting rides here and there. . . . But it ain't my fault. Well, I feel it ain't my fault. . . . They want to get there. But I can't get there.
>
> I mean, yeah, I can walk there. But sometimes I don't feel like walking from Jeanette to there all the time. That's a long walk. And then, even when I was going to classes, I paid the bus fee, bus fee, bus fee. There's times I'd run out of money by the end of the month, and I couldn't do it.

Father walked from Jeanette to Greensburg at least eight times for visits or appointments. Had he been provided with regular transportation, he was willing and would have participated in the non-offender's treatment program and hands-on parenting instruction until completion. . . . Further regarding transportation, he affirmed that the [Agency]'s efforts to provide him with transportation had commenced only "recently." . . . Regarding the presence of the unknown woman in his bathroom, a reason given by [Agency] for the termination of visits in his home, Father testified that the unknown person in the bathroom was his sister, taking a shower at his house. . . . Father stated as follows: . . .

> I tried to go do what I had to do, but I never had transportation to do it. So every time I got yelled at and, you ain't here. You ain't here. Well, the thing was I told you from the beginning that I needed a [*sic*] find a ride to get here. I'd do all of your classes for you; whatever you wanted me to do. So therefore you're showing me that, you know, look. I'm not going to provide you any rides. Well then, look. I can't be there. I told you that from the start.

On the same subject, the following exchange occurred upon questioning by the [trial c]ourt:

> A: . . . I needed help, and I don't feel that they gave me the proper help.

Q:   In what way?

A:   Transportation. . . . And I just feel that they didn't treat me right.  That's all, sir.

Trial Ct. Op., 1/18/17, at 16-18 (quoting N.T., 11/3/16, at 170, 172-74, 190-91, 198-99; citing *id.* at 172, 174, 185).

At the TPR Petition hearing, Agency introduced five orders from the 2014 dependency action[2] — dated October 16, 2014, April 9, 2015, September 24, 2015, March 31, 2016, and October 4, 2016 — along with their accompanying master's recommendations, as Ex. WCCB-3.  N.T., 11/3/16, at 105.[3]  The order of April 9, 2015, noted "that visits with Father had been moved from Father's house to Project Star's offices in Greensburg in February 2015 due to unspecified concerns regarding Father allowing individuals 'unknown to the [A]gency in his home during his visits with the [C]hildren.'" Trial Ct. Op., 1/18/17, at 5 (quoting Ex. WCCB-3, Order, 4/9/15, at 2).  The order of September 24, 2015, "notes that Father struggled over the summer to attend some visits, citing 'financial difficulties and transportation issues.'"  *Id.* at 6 (quoting Ex. WCCB-3, Order, 9/24/15, at 1).  The order of March 31, 2016, "noted that Father had . . . problems affecting his progress[, including f]ailure to appropriately maintain his home[.]"  *Id.* at 6.

_____

[2] Docket No. CP-65-DP-0000015-2014.

[3] The entire record from the dependency action was not admitted into evidence.

On January 18, 2017, the trial court denied the petition to terminate Father's parental rights to the Child and the petition to confirm consent by Mother to the Child's adoption. In an opinion, the trial court stated that, viewing the evidence presented in its totality, Father's failure or inability to participate in hands-on parenting sessions is the central reason why this matter proceeded to the filing of the TPR Petition. Trial Ct. Op., 1/18/17, at 22. The trial court stated:

> The main reason Father's transportation became so critical was the Agency's decision, early on, to terminate visitation with the child at the Father's home and to move the visitation to the offices of [Agency] and its service providers in Greensburg. . . .

> The factual basis for the Agency's critical decision to terminate visitation in Father's home is not entirely clear. The caseworker offered testimony, but since she was not assigned to the case until after the decision had been made and implemented, her understanding is based upon her review of the Agency file, and not her personal knowledge. She testified, however, that the inside of the house was cluttered with lawnmowers and parts, and that an unknown woman was present in the shower during one of the visits, whom the Child had walked in on while she was showering. No photographs of the inside of the house were offered, nor was testimony from the caseworker assigned to the case at the time of the decision to remove visits from Father's home. The only testimony regarding the identity of the unknown woman was offered by Father, who indicated that the woman was his sister. None of the testimony offered showed that a continuation of visits in Father's home posed any threat to the Child, particularly where Father would be receiving hands-on parenting instruction during such visits.

> [Agency] offered a significant amount of testimony tending to show its efforts to ensure Father had the necessary transportation and support necessary to achieve reunification. Father offered testimony to a large extent contradicting the [Agency]'s assertions. . . .

The caseworker, Ms. Bush, understood at the time of her initial assignment to the case on April 7, 2015, that Father had difficulty with transportation, that he owned a series of unreliable vehicles, and that he had resorted to walking to some of his appointments.

Father described his efforts to attend required sessions, including his vehicle reliability problem and his efforts to walk to the sessions. He testified that he had been and was willing to complete all requirements. Father clearly made significant efforts to do so. In fact, from the testimony offered by [Agency] and the service providers, Father did everything required of him except complete hands-on instruction and non-offender's treatment, both of which demanded consistent attendance at visitation sessions and appointments. According to Father, however, his pleas for assistance with transportation were mostly ignored until after the petition for termination of parental rights had been filed.

The Child Permanency Plan (CPP) dated March 4, 2015, provided as part of the visitation plan, at page H-1, that transportation was the responsibility of Father. Likewise, the revised CPP dated February 4, 2016, again set forth as part of the visitation plan that transportation was the responsibility of Father. Nowhere in either CPP is there any reference to transportation assistance being offered or provided to Father.

It is not necessary to doubt the credibility of the caseworker to conclude that whatever transportation assistance may have been offered to Father was offered on an *ad hoc* basis, sporadically, and not as part of any plan to assist Father, whom the Agency admits struggles with financial and intellectual challenges, and with acquiring the transportation essential for him to complete ordered services and achieve reunification. It is also plausible to conclude that the transportation was offered to Father only after February 4, 2016, the date of the last CPP and after the TPR Petition was filed as a prelude to the Father's rights being terminated.

Transportation assistance in this case was especially important given the termination of visits in Father's home and the testimony offered that Father did everything asked of him otherwise, that was not dependent upon consistent attendance at visitation sessions or required appointments to be made. The

- 12 -

fact that transportation does not appear to have been provided, at least not in any coherent, understandable, or planned way, or perhaps not at all until after the petition for termination of parental rights was filed, appears to have inhibited Father's reunification efforts.

Father, by the testimony of the WCCB caseworker and service providers, was cooperative and was making progress. All parties seem to agree that the fundamental reason Father was unable to complete hands-on parenting instruction and physical abuse non–offender's treatment was inconsistent visitation. The primary reason for that failing appears to be Father's difficulties with transportation. The primary reason transportation became such an important issue in this case was the largely unexplained decision to terminate visitation at the Father's home.

. . . Leading to the August 2016 visit, the Child still viewed [Father] as his father, drew a picture to give to him and looked forward to seeing him, despite Father's already limited visitation and his uncontradicted testimony that he was prevented from calling the Child by telephone at the foster home. Father failed to attend the August 2016 visit because of transportation problems and he so informed the Agency and its service providers. The Child apparently was never told that Father attempted to attend that meeting and that he had called to inform the Agency of the reason for his failure to attend. After this date, the Child seems to have given up on his father. . . .

. . . That Father expressed frustration over the lack of transportation services, which the Agency made necessary by removing the visits from Father's home, is understandable. And the fact that transportation seemingly became more available after the filing of the TPR Petition suggests that these services were provided less to help Father achieve reunification and more to prepare the termination case for presentation to the [trial c]ourt.

Based upon the record presented, the [trial c]ourt cannot without hesitancy find that the statutory requirements of (a)(2), (5) and (8) have been established. Given the lack of concerted effort to provide the transportation necessary to achieve reunification in this case, the [trial c]ourt cannot determine that the conditions which led to removal of the Child continue to

exist, or that such conditions, if they continue to exist, cannot or will not be remedied.

*Id.* at 23-27. The trial court concluded that Agency "had not met its burden." *Id.* at 27.

The trial court explained its decision to deny the Consent Petition as follows:

> The Adoption Act, 23 Pa.C.S.A. § 2101 *et seq.*, provides for the [trial c]ourt's authority and discretion in proceeding upon adoption petitions and, prior thereto, proceeding to terminate parental rights either voluntarily or involuntarily. The present proceeding to terminate Mother's parental rights was pursuant to 23 Pa.C.S.A. § 2504, which provides an alternative procedure for voluntary relinquishment of parental rights by execution of consents to an adoption followed by petition to the [trial c]ourt for hearing thereon. Section 2504 provides in pertinent part relative to the substance and outcome of hearings on § 2504 petitions as follows:
>
> > **(a) Petition to confirm consent to adoption. --** If the parent or parents of the child have executed consents to an adoption, upon petition by the intermediary . . . the court shall hold a hearing for the purpose of confirming a consent ....
> >
> > **(b) Hearing. --** Upon presentation of a petition filed pursuant to this section, the court shall fix a time for a hearing . . . . After hearing, . . . the court *may enter a decree of termination of parental rights* . . . and duties, including the obligation of support, in the case of a relinquishment to an agency.
>
> 23 Pa C.S.A. § 2504 (emphasis added). The language of subparagraph (b), read in conjunction with subparagraph (a), indicates that, when considering such a petition, the [trial c]ourt must determine more than the validity of the parent's consent; it must also determine whether the consenting parent's rights should be terminated.

The statutory language requires the [trial c]ourt to consider the consent in its context, that of a proceeding for the adoption of a child. Based upon the record and facts as set forth above, and more fully in th[e trial c]ourt's January 18th Opinion and Order of Court, the [trial c]ourt does not find that it is in the best interests of the Child to terminate Mother's parental rights where no new parent-child relationship is contemplated as a consequence of th[e trial c]ourt's decision not to terminate Father's parental rights.

The circumstances in this case, relative to termination of Mother's parental rights where Father's parental rights remain intact, are akin to stepparent adoption cases where following the termination of one parent's rights, but prior to the adoption being finalized, the adoption falls through because of a separation between the prospective stepparent and the other natural parent. Pennsylvania courts' review of those cases reveals "that the Adoption Act provides for termination of parental rights only in connection with a plan for adoption," and that the law abhors the judicial creation of a parental vacuum where such void will not be filled within a new family unit. *In re B.E.*, 377 A.2d 153, 154 (Pa. 1977); see also *In re Adoption of J.D.S.*, 763 A.2d 867, 871 (Pa. Super. 2000) ("Termination of the natural parent's rights prior to adoption and allowance of stepparent adoption is for the purposes of protecting the integrity and stability of the new family unit") and *In re Adoption of L.J.B.*, 18 A.3d 1098, 1108 n.11 (Pa. 2011) ("The public policy behind this is simple: Pennsylvania will not countenance state-created orphans").

"Termination of parental rights permits the child and the adoptive . . . parents to establish a new parent-child relationship through adoption". *In re B.E.*[, 377 A.2d] at 156. Here, no new parent-child relationship is contemplated and thus the termination of Mother's parental rights, whether or not consented to, is not warranted, necessitated or suited to the best interests of the Child at this time.

Trial Ct. Op., 3/6/17, at 3-4.

Agency appealed on February 16, 2017, and now raises the following

issues:

1.      The trial court erred in denying [the TPR Petition] pursuant to 23 Pa. C.S.A. § 2511 (a)(2), (a)(5), (a)(8) and (b) and abused its discretion by giving significant and weighty consideration to evidence outside the record without providing [Agency] an opportunity to respond, and improperly applying this evidence to reach its final decision;

2.      The trial court erred in denying [the Consent Petition], consented to by Mother . . . pursuant to 23 Pa. C.S.A. § 2711 and § 2504 where the record clearly evidences that the Consent was properly executed and at no time did Mother or her counsel challenge the validity of the Consent; and that the trial court abused its discretion when concluding that the [Consent Petition] is inextricably intertwined with the [TPR Petition] of Father and applied this as the only basis for its final decision to deny the [Consent] Petition.

Agency's Brief at 4.

## Petition to Terminate Father's Parental Rights

We consider Agency's first issue in light of our well-settled standard of review in actions for termination of parental rights:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The only issue raised by Agency in challenging the trial court's decision to deny its TPR Petition is that the trial court "appl[ied] significant consideration to evidence outside the record":

> [I]n the Opinion of the [trial c]ourt, dated January 18, 2017 . . . the [trial c]ourt provides "a brief introduction and review of the relevant facts of the case as set forth in the record of the dependency action at docket number CP-65-DP-15-2014…"; and references an "Order of Court dated January 26, 2012 ("January 2012 Custody Order") at docket number 156 of 2012-D"; and "The Child Permanency Plan (CPP) dated March 4, 2015…Likewise, the revised CPP dated February 4, 2016…" .
>
> The record of the [2014] dependency action was not admitted as evidence at the hearing on the Petition for Involuntary Termination of Parental Rights, although certain of its documents were; there is no reference at the same hearing to the custody actions filed between Mother and Father; neither the Agency, nor the Father, nor the [trial c]ourt, entered into evidence any of the Agency's Child Permanency Plans.
>
> Additionally, the [trial c]ourt in its Opinion [of January 18, 2017,] utilizes the contents of the CPP documents, without proper context, to disparage the Agency and caseworker, and draw conclusions that the evidence presented and admitted to the record at the hearing does not support.

Agency's Brief at 13-14 (quoting Trial Ct. Op., 1/18/17, at 2-3, 24; citing *id.* at 25-26). Agency therefore appears to be challenging the trial court opinion's inclusion of (1) the January 2012 Custody Order, (2) the entirety of the 2014 dependency docket, (3) the CPPs dated March 4, 2015, and

February 4, 2016, and (4) any custody actions between Mother and Father. *See id.*[4]

Agency does not cite any decisional law in support of its argument.[5] Although we have not addressed this issue in a termination proceeding, in a child and spousal support case we held: "A trial court may not consider evidence outside of the record in making its determination. Nor may this court uphold a trial court's order on the basis of off-the-record facts." ***Ney v. Ney***, 917 A.2d 863, 866 (Pa. Super. 2007) (internal citations and quotation marks omitted); ***see also M.P. v. M.P.***, 54 A.3d 950, 954 (Pa. Super. 2012) (a trial court may not consider evidence outside the record in making its decision). The same bar applies here. At bottom, this prohibition stems from due process concerns. "The right of a litigant to in-court presentation of evidence is essential to due process: 'In almost every

---

[4] The trial court had filed an opinion with its order denying the TPR Petition on January 18, 2017. The trial court opinion of January 18, 2017, does not address Agency's concern that the trial court considered evidence outside the record. The trial court did not file a separate opinion for the TPR Petition subsequent to the notice of appeal, even though Agency had simultaneously filed its statement of matters complained of on appeal with its notice of appeal pursuant to the Children's Fast Track requirements of Pa.R.A.P. 1925(a)(2). In its Rule 1925 Statement, Agency said that the trial court "abused its discretion by giving significant consideration in its ruling to evidence outside the record to which [Agency] had no opportunity to respond[.]" Rule 1925 – Concise Statement of Errors, 2/16/17, at ¶ 1.

[5] Agency relies on Canon 2 of the Code of Judicial Conduct, 33 Pa. Code § 2.9(C) ("A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed"). No party argued that the trial court could take judicial notice of the documents at issue. *See* Pa.R.E. 201.

setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.'" **Wood v. Tucker**, 332 A.2d 191, 192 (Pa. 1974) (quoting **Goldberg v. Kelly**, 397 U.S. 254, 269 (1970)). In evaluating whether the trial court erred, this Court reviews for an abuse of discretion. **Ney**, 917 A.2d at 868.

In this case, the only references to the January 2012 Custody Order appear in the "Introduction" section of trial court opinion of January 18, 2017, and help to establish a chronology for this Court and to explain the existing custody situation prior to Agency's filing of the TPR Petition. **See** Trial Ct. Op., 1/18/17, at 3-4. The trial court does not cite to this order again, including in its analysis. The references are therefore harmless and thus do not constitute an abuse of the trial court's discretion.

Additionally, contrary to the suggestion in Agency's argument, the trial court does not reference portions of the 2014 dependency docket that are outside the record. Instead, the trial court's only references are to the orders entered by Agency as Exhibit WCCB-3, which the trial court cites throughout its summary of the 2014 dependency action. **See** Trial Ct. Op., 1/18/17, at 4 (citing Order, 10/16/14, with accompanying Master's Recommendation, 10/14/14), at 5 (citing Order, 10/16/14; Order, 4/9/15, with accompanying Master's Recommendation, 3/26/15; Order, 9/24/15, with accompanying Master's Recommendation, 9/21/15), at 6 (citing Order, 9/24/15; Order, 3/31/16, with accompanying Master's Recommendation,

3/16/16; Order, 10/4/16, with accompanying Master's Recommendation, 9/26/16); at 7 (citing Order, 10/4/16). Similar to the "Introduction," this summary of the 2014 dependency action provides background to this Court, explaining the circumstances leading to Agency's TPR Petition. Thus, even if the trial court's references were not supported by exhibits submitted by Agency during the TPR Petition hearing, the trial court's inclusion of this account of the 2014 dependency action would not be a ground for reversal.

We reach a different conclusion regarding the trial court's use of the CPPs, however. The crux of this case is Father's transportation difficulties. There is no dispute that Father could not provide reliable transportation on his own, as was testified to by all of the witnesses at the TPR Petition hearing, including Agency's own witnesses, Ms. Ackourey, Ms. Reed, Ms. O'Malley, and Ms. Bush. N.T., 11/3/16, at 3, 24-26, 35-38, 41-42, 109, 112, 148, 170, 172-74, 190-91, 198-99. Father testified that Agency never provided him with transportation, beyond informing him that bus passes were available at its office. *Id.* at 172-74, 190-91, 198-99; Trial Ct. Op., 1/18/17, at 16-18. Ms. Bush testified that Agency offered Father transportation beginning in June 2015, but Father did not take advantage of the service. N.T., 11/3/16, at 109-10, 148; Trial Ct. Op., 1/18/17, at 14-15.

It was in connection with this issue that the trial court cited to the March 4, 2015 and February 4, 2016 CPPs, which were never entered into the record in this action. The trial court stated, "Nowhere in either CPP is

there any reference to transportation assistance being offered or provided to Father" and that it was "plausible to conclude that the transportation was offered to Father only after February 4, 2016, the date of the last CPP and after the TPR Petition was filed as a prelude to the Father's rights being terminated." Trial Ct. Op., 1/18/17, at 24-25. Later, the court stated: "The fact that transportation does not appear to have been provided, at least not in any coherent, understandable, or planned way, or perhaps not at all until after the petition for termination of parental rights was filed, appears to have inhibited Father's reunification efforts." *Id.* at 25. Thus, the trial court discerned from the CPPs that Agency had placed the responsibility for transportation on Father and that Agency did not provide transportation assistance to Father prior to February 4, 2016.

> Agency argues:
>
> The Agency had no opportunity to examine the CPP documents in advance and prepare testimony and evidence to provide the proper context for those documents. Thus, prejudice has occurred against the Agency. Further, the Court has misapplied the information contained in the CPP documents, thereby arriving at an erroneous conclusion substantiated only by *ex parte* communication.

Agency Brief at 14. Agency's argument that it was entitled to an opportunity to address the CPPs is well taken. To the extent the trial court relied on those materials to draw conclusions adverse to Agency, we believe Agency deserved an opportunity to address that evidence.

In addition, we cannot determine whether the trial court would have concluded that Agency had not provided sufficient transportation assistance to Father if the CPPs had not corroborated Father's testimony that he was not offered sufficient assistance by Agency. Without the CPPs, the trial court's determination of whether Agency provided transportation assistance to Father would be a matter of weighing Ms. Bush's testimony and Father's testimony against each other, without the CPPs tipping the scale in Father's favor. We therefore cannot say that the trial court's consideration of the CPPs was harmless.

Because the trial court impermissibly relied on evidence outside of the record in this TPR matter, we conclude it abused its discretion. *Cf. Ney*, 917 A.2d at 866. For that reason, we vacate the orders below and remand to the trial court for further proceedings during which either party may introduce the CPPs into the record, where their content may be contested. We leave it to the trial court to determine whether and to what extent a new factual hearing is required. Because of the nature of this proceeding, any new hearing shall be held as soon as possible. Nothing in our disposition shall be construed to preclude the trial court from reaching the same result as it did prior to this appeal, if the trial court determines that such a result is appropriate.

**Consent Petition**

In declining to approve the Consent Petition, the trial court denied Agency's request to terminate Mother's parental rights and to allow the Child's adoption. The trial court reached that result because it concluded that the Consent Petition was closely related to the petition to terminate Father's rights, which it denied. Because we remand the trial court's denial of the TPR Petition relating to Father, the basis for the trial court's denial of the Consent Petition is no longer applicable, and we therefore vacate the trial court's decision relating to the Consent Petition so that the court may reconsider that issue in connection with its decision on the TPR petition.

In conclusion, because the trial court impermissibly considered evidence outside the record, we remand for further proceedings to be held **as soon as possible.**[6]

Orders vacated. Case remanded for further action consistent with this memorandum. Jurisdiction relinquished.

---

[6] The orders on appeal did not affect Agency's custody of the Child, and, thus, the Child shall continue to remain in its care pending further order of the court. Indeed, no party has requested that the Child be removed from Agency's care.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2017